**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| JOCELYN DIONNE CAMPBELL | ) |
| 108 Rendition Drive, | ) |
| McDonough, GA 30253 | ) |
| | ) |
|       Plaintiff, | )      Civ. No. _____ |
| | ) |
| vs. | ) |
| | ) |
| | ) |
| WILLIAM S. SCHMIDT, in his official capacity | ) |
| As the Suspension and Debarment Official, | ) |
| Suspension & Debarment Division of the | ) |
| U.S. General Services Administration, | ) |
| 1800 F Street NW, | ) |
| Washington, DC 20405, | ) |
| | ) |
| EMILY W. MURPHY, in her official capacity | ) |
| As the Administrator of the | ) |
| U.S. General Services Administration | ) |
| 1800 F Street NW, | ) |
| Washington, DC 20405, | ) |
| | ) |
| U.S. GENERAL SERVICES | ) |
| ADMINISTRATION | ) |
| 1800 F Street NW, | ) |
| Washington, DC 20405, | ) |
| | ) |
| and | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
|       Defendants. | ) |

_____)

**COMPLAINT**

Plaintiff Jocelyn Dionne Campbell seeks relief from the unlawful debarment imposed on

her by Defendant U.S. General Services Administration through its Suspension and Debarment

Official, Defendant William Schmidt.  The Defendants have failed to comply with federal law

and regulations, and the debarment constitutes final agency action that is arbitrary, capricious, an

abuse of discretion, unsupported by substantial evidence, and contrary to law and regulation, in violation of the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* Prompt intervention by the Court is needed to prevent irreparable harm and permit Ms. Campbell to earn a livelihood for herself and her family, especially in this time of national crisis due to the Coronavirus.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action seeks judicial review of final agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*

2.      Venue is proper under 28 U.S.C. § 1391(e)(1) because the Defendants' principal place of business is located in this District, and a substantial part of the events giving rise to the claims occurred here, including the issuance of the debarment decision.

## PARTIES

3.      Plaintiff is an individual currently residing in Georgia.

4.      Defendant U.S. General Services Administration ("GSA" or "Government") is an agency of the United States Government headquartered at 1800 F Street NW, Washington DC 20405.

5.      Defendant William S. Schmidt is the Suspension and Debarment Official ("SDO") of GSA's Suspension & Debarment Division.

6.      Defendant Emily W. Murphy is the Administrator of the GSA.

## STATEMENT OF FACTS

**Federal Debarment Regulations**

7.      The Federal Acquisition Regulation ("FAR"), promulgated at Title 48, Chapter 1 of the Code of Federal Regulations, states: "Agencies shall solicit offers from, award contracts

to, and consent to subcontracts with responsible contractors only."  FAR 9.402(a).  The FAR further states that "Debarment and suspension are discretionary actions that, taken in accordance with [FAR subpart 9.4], are appropriate means to effectuate this policy."  *Id.*  "Debarment" means a company or individual is ineligible for a stated period to bid on federal government contracts or to participate in  "nonprocurement transactions" including "grants, cooperative agreements, scholarships, fellowships, contracts of assistance, loans, loan guarantees, subsidies, insurance, payments for specified use, and donation agreements."  FAR 9.401; FAR 9.405(a); FAR 9.403 ("Definitions").

8.     The FAR also states "[t]he serious nature of debarment and suspension requires that these sanctions be imposed only in the public interest for the Government's protection and not for purposes of punishment."  FAR 9.402(b).  Agencies may only "impose debarment or suspension to protect the Government's interest and only for the causes and in accordance with the procedures set forth in [FAR subpart 9.4]."  *Id*.

9.     The FAR sets forth criteria regarding potential causes for debarment, such as conviction or civil judgment for commission of fraud or certain other criminal offenses, willful failure to perform in accordance with the terms of one or more contracts, or another cause "of so serious or compelling a nature that it affects the present responsibility of the contractor…."  *See* FAR 9.406-2.

10.     Additionally, the "fraudulent, criminal, or other seriously improper conduct of a contractor may be imputed to any officer, director, shareholder, partner, employee, or other individual associated with the contractor who participated in, knew of, or had reason to know of the contractor's conduct."  FAR 9.406-5(b).

11.     To protect the due process rights of entities and individuals, the FAR sets forth procedures an agency must follow to impose debarment on an entity or individual. Among other

requirements, an agency must (i) provide written notice of the proposed debarment by certified mail, return receipt requested; (ii) provide the entity or individual the opportunity to submit information and argument in opposition to the proposed debarment, (iii) determine whether the submission in opposition raises a genuine dispute of material fact,  and if so engage in fact-finding proceedings and prepare written findings of fact; and (iv) in cases where a proposed debarment is not based upon a conviction or civil judgment, establish the cause for debarment by a preponderance of the evidence.  *See* FAR 9.406-3.

12.     If the SDO determines debarment is appropriate, the SDO must provide the affected entity or individual prompt written notice of debarment "specifying the reasons for debarment" and stating the period of debarment.  FAR 9.406-3(e)(1)(ii)-(iii).  Debarment "shall be for a period commensurate with the seriousness of the cause(s)," and generally "should not exceed 3 years."  FAR 9.406-4(a).

**T3 Resources, Inc.**

13.     Ms. Campbell formed T3 Resources, Inc. ("T3") in March 2003.

14.     T3 was a small, minority- and woman-owned company.  In the early years of its operation, T3's work primarily involved the construction of churches in Atlanta, Georgia and Washington, DC.

15.     After several years of performing commercial and municipal contracts, T3 became certified as an 8(a) business by the U.S. Small Business Administration ("SBA").  To qualify as an 8(a) business, a company must, among other conditions, be at least 51% owned by U.S. citizens who are socially and economically disadvantaged, and who fall below certain dollar thresholds for personal net worth and annual income.

16.     In 2006, T3 entered into a Mentor/Protégé Agreement with Motir Services, Inc. ("Motir"), another established 8(a) certified business.  The Mentor/Protégé Agreement was filed with SBA in 2006.

17.     The SBA Regulations then in effect stated the mentor/protégé program "is designed to encourage approved mentors to provide various forms of assistance to eligible Participants. This assistance may include technical and/or management assistance; financial assistance in the form of equity investments and/or loans; subcontracts; and/or assistance in performing prime contracts with the Government in the form of joint venture arrangements. The purpose of the mentor/protege relationship is to enhance the capabilities of the protege and to improve its ability to successfully compete for contracts."  13 C.F.R. § 124.520(a) (2004).  Further, "[n]o determination of affiliation or control may be found between a protege firm and its mentor based on the mentor/protege agreement or any assistance provided pursuant to the agreement." *Id* at § 124.520(d)(4) (2004).

18.     As an 8(a) certified business and the protégé of Motir, T3 began pursuing federal contracts and subcontracts in addition to its commercial and municipal work.  T3's federal contracts and subcontracts were all relatively low dollar value contracts.  The value of T3's largest federal prime contract was less than $500,000.

19.     T3 ceased business operations in 2011.

**The 2015 FBI Interview**

20.     In or about March 2015, the FBI contacted Ms. Campbell through her brother, stating it was investigating Motir and Emmanuel Irono, the owner of Motir.  The FBI requested that Ms. Campbell participate in an interview with the FBI.  Ms. Campbell informed the FBI she was living in Nigeria but would return to the United States in May 2015.

21.     In May 2015, Ms. Campbell participated in an interview at the FBI's office in Birmingham, Alabama.  Ms. Campbell lived in Birmingham, Alabama at the time, and informed the FBI of her then-current address.

**The Notice of Proposed Debarment**

22.     On or about September 11, 2019, then GSA Suspension and Debarment Official ("SDO") Maria Swaby sent Ms. Campbell by certified mail, return receipt requested a letter titled Notice of Proposed Debarment of Jocelyn Campbell (the "Notice of Proposed Debarment").

23.     The Notice of Proposed Debarment was twelve pages in length and included approximately ten pages of factual allegations.  Of those, eight pages described the alleged actions of other individuals and entities, including (a) Motir, its owner Emmanuel Irono, and several current or former Motir employees; and (b) Dimensional Solutions, Inc. ("DSI") and its owner Anthony Ray.  In these eight pages the SDO alleged, *inter alia*, that:

A.     Motir was a Washington, D.C. based company that provided a broad range of contract services to federal, state, municipal, and commercial clients.  At one time, Motir was an 8(a) certified business with the SBA, eligible to compete for certain contracts set aside for 8(a) certified businesses.  From approximately 2004-2009, Motir held a GSA contract to provide moving services to the White House (the "2004 White House Contract").

B.      In 2009, Motir's five-year term for the White House contract ended and GSA issued a solicitation to re-compete the contract (the "2009 White House Contract").  Motir was not eligible to compete for the 2009 White House contract because it was graduating from the SBA's 8(a) program.

C.     Mr. Ray was Motir's Project Manager for the 2004 White House Contract.  Motir's owner, Mr. Irono, offered to assist Mr. Ray in obtaining Government

contracts in exchange for a percentage of DSI's profits.  Mr. Irono also offered to assist Mr. Ray in obtaining 8(a) certified status for DSI.

D.    After Mr. Ray and Mr. Irono entered into this agreement, Mr. Irono and several other Motir employees were added as signatories to DSI's bank accounts. Subsequently, numerous transactions were made from DSI's accounts of which Mr. Ray claimed to have no knowledge, including (i) $63,000  deposited and later withdrawn from DSI's accounts; (ii) falsified payroll checks made to individuals who had never worked for DSI; and (iii) payments made by Mr. Irono to his wife from DSI funds.

E.    Mr. Irono and Motir employees assisted DSI with preparing DSI's proposal for the 2009 White House contract, including the pricing, representations and certifications, and past performance sections.  DSI's proposal listed five separate companies as past performance references, and falsely identified Motir employees as the points of contact for those companies.  Several of the Motir employees listed in DSI's proposal were contacted by the Government during its evaluation of DSI's proposal, and knowingly submitted false past performance reviews.

F.    DSI was awarded the 2009 White House Contract on August 17, 2009.

G.    At an undefined later date, Mr. Ray learned that Mr. Irono was paying his wife from DSI funds and submitting contract proposals without Mr. Ray's permission. Mr. Ray confronted Mr. Irono and then severed ties with him. Mr. Ray changed his bank accounts, System for Award Management ("SAM") passwords, and ceased speaking with Mr. Irono in 2011.

H.    On February 20, 2015, special agents executed a search and seizure warrant pursuant to which investigators obtained hand-written journals from Motir

employees.  One hand-written entry dated June 1, 2009 stated "GSA Whitehouse. Motir – bid minimum, lowest; Dimensional – 2nd; T3 – 3rd."  The same entry also stated: "All bids now should be in triple – Motir, Dimensional, T3 Resources."  A different hand-written journal entry dated July 19, 2009 stated: "Have Dimensional ready on Thursday – submitting Friday; DSI lowest, T3 second, Motir highest."  The Notice of Proposed debarment did not identify the author(s) of these journal entries.

24.    The Notice of Proposed Debarment did not allege that Ms. Campbell participated in, knew of, or had reason to know of these alleged activities, nor did it explain the relevance, if any, of these factual allegations to the proposed debarment of Ms. Campbell.

25.    Less than two pages of the Notice of Proposed Debarment pertained to the alleged actions of Ms. Campbell.  These pages purported to summarize topics of discussion from the FBI's May 2015 interview with Ms. Campbell.  Specifically, the Notice alleged that:

A.    Ms. Campbell started T3 in Atlanta in 2003.  T3 was an 8(a) certified small business with the SBA.

B.    Ms. Campbell met Motir's owner, Mr. Irono, at a small business conference in 2004 or 2005.  Motir hired T3 as a consultant in 2005 and allowed T3 to lease office space within Motir's headquarters in Capitol Heights, Maryland.  Motir and T3 submitted a mentor/protégé agreement with the SBA.  Ms. Campbell was never a Motir employee but served as a consultant through T3 and had Motir business cards.

C.    A Motir employee was for a time an authorized signer for T3's bank account because Ms. Campbell travelled back and forth between the United States and

8

Africa and needed someone to manage the account while she was out of the country.

D.      During the time T3 worked with Motir, T3 held only a single U.S. Government prime contract, with the National Guard Armory.  Much of the money that the Government paid to T3 was transferred to Motir as its employees were responsible for the contract administration tasks associated with the contract.

E.      Ms. Campbell assisted Mr. Ray with administrative tasks related to the formation of DSI, including helping Mr. Ray to set up DSI's bank account and obtain 8(a) certification with the SBA.

F.      Ms. Campbell "fabricated" two "fake contract[s]" to reflect work that Mr. Ray claimed to have performed, but for which he did not have written proof of the work performed.  The Notice did not identify when or how this "fabrication" allegedly occurred.

G.      Ms. Campbell "freely admitted that DSI could not have performed this work [in April 2005] because DSI was not even created at that time."  Elsewhere, the Notice stated that Mr. Ray formed DSI in 2004.

H.      Ms. Campbell stated that she had limited knowledge of the White House contract as her work was more focused on the construction side of the business, and that she did not know why Motir, DSI, and T3 all bid on the White House contract in 2009.  She further stated that she did not recall T3 being involved in the White House contract, and that she had no involvement in writing the proposals for the White House contract.

I.      In April 2011, Ms. Campbell directed a Motir employee to create T3 resumes for certain Motir personnel to be used in an unidentified T3 proposal.  Ms. Campbell

did not believe this was improper because in the event T3 was awarded the contract, the proposed personnel would perform work under the contract pursuant to a subcontract between T3 and Motir.

J.      Neither Motir, DSI, nor T3 would reveal if they worked together in preparing a proposal for the Government, and Ms. Campbell did not believe they were required to do so.

K.      In 2010 or 2011, T3 moved out of the office space it leased from Motir into new space in Bowie, Maryland.  After T3 moved, it stopped transferring funds to Motir.

26.     Following the recitation of alleged facts, the Notice of Proposed Debarment asserted, without more:  "Your actions provide the bases for your proposed debarment under FAR 9.406-2(b)(1)(i)(A) and FAR 9.406-2(c)."

27.     FAR 9.406-2(b)(1)(i)(A) permits an agency to debar a contractor for:  "Violation of the terms of a Government contract or subcontract so serious as to justify debarment, such as – (A) Willful failure to perform in accordance with the terms of one or more contracts."

28.     FAR 9.406-2(c) permits an agency to debar a contractor or subcontractor "based on any other cause of so serious or compelling a nature that it affects the present responsibility of the contractor or subcontractor."

29.     The Notice of Proposed Debarment further stated: "Within thirty (30) calendar days after receipt of this notice, you or a representative acting on your behalf may submit, either in person, or in writing, or both, information and argument in opposition to the proposed debarment…Your written submission, if any, should include any specific information that may raise a genuine dispute over material facts.  If it is found that the information or argument

submitted raises a genuine dispute over material facts, fact finding may be conducted to determine the disputed facts, in accordance with GSAM 509.406-3(d)(3)."

30.     The Notice of Proposed Debarment was sent via Certified Mail – Return Receipt Requested to an address in Lithonia, Georgia.  Ms. Campbell had previously used this address as her temporary mailing address while she was in Africa on business.

31.     Ms. Campbell lived with her mother in Birmingham, Alabama from May 2015 through July 2017.  The Notice of Proposed Debarment noted that "On May 6, 2015, [Ms. Campbell was] interviewed by special agents from the FBI Birmingham field office."  The FBI was aware of Ms. Campbell's Birmingham, Alabama address.  SDO Swaby, based on the FBI interview, was on notice when she mailed the Notice of Proposed Debarment that Ms. Campbell did not reside at the Lithonia, Georgia address.

32.     Because the Notice of Proposed Debarment was sent to an outdated address, Ms. Campbell did not receive it.  Ms. Campbell was therefore unable to submit information or argument in opposition to the proposed debarment within the 30 days prescribed by the Notice.

33.     Ms. Campbell now owns a home in McDonough, Georgia, where she has resided since June 2018.

34.     Although Ms. Campbell no longer lives in Birmingham, Alabama, her mother still resided at Ms. Campbell's former Birmingham address in September 2019.  Had SDO Swaby sent the Notice of Proposed Debarment to either Ms. Campbell's mother's address in Birmingham or to Ms. Campbell's current McDonough, Georgia address, Ms. Campbell would have promptly received the Notice and had an opportunity to respond timely.

35.     The GSA SDO failed to comply with federal regulations applicable to notices of proposed debarment by, *inter alia*:

A.     Failing to send the Notice of Proposed Debarment to the correct address;

B.      Once GSA received the U.S. Postal Service Certified Mail Receipt stating that the Notice of Proposed Debarment was unclaimed, failing to attempt to find her correct address or otherwise ensure she received the Notice of Proposed Debarment, even though the FBI located Ms. Campbell in Birmingham in 2015, and the FBI's report containing that information was in the hands of the SDO when she sent the Notice of Proposed Debarment to the outdated address;

C.      Failing to provide any analysis or explanation of how the facts alleged in the Notice provide any basis for proposed debarment under FAR 9.406-2(b)(1)(i)(A) and FAR 9.406-2(c);

D.      Failing to identify any specific contract or subcontract provision, law, or regulation that Ms. Campbell violated by her alleged conduct;

E.      Failing to identify whether the proposed debarment was based solely on the factual allegations pertaining to the conduct of Ms. Campbell, or whether the SDO also imputed to her the factual allegations pertaining to the conduct of other individuals and entities;

F.      To the extent the SDO relied on factual allegations pertaining to the conduct of other individuals and entities, failing to demonstrate that Ms. Campbell participated in, knew of, or should have known of such conduct; and,

G.      Failing to identify how any alleged conduct of Ms. Campbell between 2003 and 2011 was "of so serious or compelling a nature" that it affected Ms. Campbell's "present responsibility" in September 2019.

**The Notice of Final Debarment**

36.     On or about December 18, 2019, GSA Acting SDO William Schmidt[1] sent Ms.

Campbell a letter titled Notice of Debarment of Jocelyn Campbell ("Notice of Final Debarment")

to the same outdated Lithonia, Georgia address as the earlier Notice of Proposed Debarment.

37.     The Notice of Final Debarment referenced the Notice of Proposed Debarment and

stated "GSA received evidence, in the form of a return United States Postal Service Certified

Mail receipt, that the Notice was unclaimed at the address above on October 5, 2019.  As of this

date, GSA has not received a response to the Notice."

38.     Nevertheless, the Notice of Final Debarment stated that "After careful

consideration of the information contained in the record in this matter, I have determined that

cause for your debarment exists pursuant to Federal Acquisition Regulation (FAR) 9.406-2(c)

and that the Government's interest requires your debarment."

39.     The Notice of Final Debarment consisted of a single page.  Other than a reference

to "the information contained in the record in this matter," the Notice of Final Debarment

contained no statement of the cause for debarment nor any explanation of the factual or legal

basis for the SDO's decision to debar Ms. Campbell.

40.     The Notice of Final Debarment stated that Ms. Campbell's debarment would last

for a period of three years from the issuance of the Notice of Proposed Debarment, *i.e.*, the

maximum length permitted under the FAR absent extenuating circumstances.

41.     Ms. Campbell did not receive the Notice of Final Debarment.

42.     Ms. Campbell learned of her debarment on or about December 21, 2019, when

her employer, Homestead Hospice, informed her that her name was listed on the Government's

---

[1] Maria Swaby, the GSA SDO at the time the Notice of Proposed Debarment was sent, is now
the GSA Procurement Ombudsman.

System for Award Management ("SAM") website.  Homestead Hospice, a recipient of federal funds, informed Ms. Campbell that if the debarment was not resolved by March 1, 2020, Ms. Campbell would be terminated.

43.    The GSA Acting SDO failed to comply with federal regulations applicable to notices of final debarment by, *inter alia*:

A.    Issuing the Notice of Final Debarment to the same outdated address when he had reason to know that Ms. Campbell did not reside there and did not receive the Notice of Proposed Debarment;

B.    Failing to provide Ms. Campbell an opportunity to respond to the Notice of Proposed Debarment before the Notice of Final Debarment was issued;

C.    Failing to exercise diligence to find Ms. Campbell's correct address or ensure she received the Notice of Final Debarment;

D.    Failing to provide any explanation of the factual or legal bases for debarment;

E.    Failing to assess whether there were any genuine disputes of material fact that would necessitate fact-finding procedures;

F.    Failing to identify whether the debarment was based solely on the factual allegations in the Notice of Proposed Debarment pertaining to the conduct of Ms. Campbell, or whether the GSA Acting SDO also relied on the factual allegations pertaining to the conduct of other individuals and entities, imputing that alleged conduct to Ms. Campbell;

G.    To the extent the GSA Acting SDO imputed to Ms. Campbell factual allegations in the Notice of Proposed Debarment pertaining to the conduct of other individuals and entities, failing to demonstrate that Ms. Campbell participated in, knew of, or should have known of such conduct;

H.    Failing to determine that debarment was supported by a preponderance of the evidence;

I.    Failing to identify how any alleged conduct of Ms. Campbell between 2003 and 2011 was "of so serious or compelling a nature" that it affected Ms. Campbell's "present responsibility" in December 2019.

**Post-Debarment Communications with GSA**

44.    On January 6, 2020, Edward Arnold, an attorney with Seyfarth Shaw LLP ("Seyfarth"), informed GSA Integrity Officer Dylan Mooney he represented Ms. Campbell.  On January 21, 2020, Mr. Arnold again spoke with Mr. Mooney and requested permission to submit a delayed response. Mr. Mooney granted Mr. Arnold's request.

45.    In mid-to-late January 2020, Seyfarth concluded that Ms. Campbell should be represented by other counsel because of concern over potential conflict of interest.  On January 30, 2020, Ms. Campbell retained undersigned counsel John Pachter, Smith Pachter McWhorter PLC ("SPM"), to represent her in the GSA debarment proceeding.

46.    On January 30, 2020, Mr. Pachter left a voicemail for Mr. Mooney stating that he represented Ms. Campbell regarding the GSA Notice of Final Debarment.  Mr. Pachter sent a follow up email to Mr. Mooney at 1:30 pm on the same day, requesting to schedule a call.  Mr. Pachter received an automated message stating that Mr. Mooney was out of the office for a family emergency.

47.    The next day, January 31, 2020, Mr. Pachter submitted to Mr. Mooney a letter requesting relief from the debarment sanction on behalf of Ms. Campbell and T3 Resources, Inc. (the "January 31, 2020 Letter").  As Mr. Mooney was out of the office for a family emergency, Mr. Pachter copied Acting SDO Schmidt and GSA Integrity Officer Sarah Drabkin.

48.     The January 31, 2020 Letter requested "urgent and expedited treatment" because Ms. Campbell's "employer Homestead Hospice, a recipient of federal funds, informed Ms. Campbell her employment will be terminated if the debarment is not terminated by March 1, 2020."

49.     The January 31, 2020 Letter attached a signed Declaration from Ms. Campbell (the "January 31, 2020 Campbell Declaration") and a copy of Ms. Campbell's resume.

50.     The January 31, 2020 Letter and the January 31, 2020 Campbell Declaration asserted numerous facts challenging or directly contradicting the allegations in the Notice of Proposed Debarment, including:

A.      The Notice of Proposed Debarment and Notice of Final Debarment were sent to a former address in Lithonia, Georgia.  Although the property is owned by Ms. Campbell's sister, it is leased to a tenant who apparently disregarded the notices of attempted delivery to a person who did not live at the address.

B.      The SDO knew that the FBI interviewed Ms. Campbell in Birmingham, Alabama in 2015, and was aware of Ms. Campbell's Birmingham address.  Had the letters been sent to that address, Ms. Campbell would have received them in time to respond within the deadline stated.

C.      Ms. Campbell was the owner of T3 from its inception in March 2003 until it closed business in 2011.  T3 was initially engaged in the construction of churches in Washington, D.C.  Ms. Campbell registered T3 as a small, woman-owned business in the SBA 8(a) program.

D.      In 2006, T3 entered into a Mentor/Protégé Agreement with Motir to team with Motir's construction division.  The Mentor/Protégé Agreement was filed with SBA in 2006, but Ms. Campbell no longer had a copy of the agreement.

16

E.    The SBA Mentor/Protégé program allows a large business to assist small business partners in various ways, including sharing of employees.  Ms. Campbell had experience with employee sharing with large and small businesses, which she believed was "the norm."  The employees Motir shared with T3 were under Ms. Campbell's direction and supervision.

F.    Ms. Campbell had Motir business cards because she was a consultant for Motir and represented Motir as a consultant at certain meetings with government officials.

G.    Ms. Campbell assisted Mr. Ray in getting DSI certified as an 8(a) contractor, but only as a facilitator, limited to filling out paperwork based on information provided to her by Mr. Ray.

H.    Ms. Campbell did not "create" a "fake contract between DSI and SECF," nor did she "fabricate" another contract between DSI and Motir.  She merely downloaded contract forms from the internet and entered information provided to her by Mr. Ray regarding his prior experience.

51.    The January 31, 2020 Letter and the January 31, 2020 Campbell Declaration also asserted numerous facts supporting Ms. Campbell's present responsibility, including:

A.    Ms. Campbell began her professional career in hospice work.  She returned to that field in 2017, as the Operational Administrator for Homestead Hospice in Jackson, Georgia, responsible for operational and financial management for sixteen South Georgia counties.  In that role, she supervised 33 team members, including doctors, nurse practitioners, nurses, certified nursing assistants, social workers, and chaplains.  Under Ms. Campbell's leadership, her group grew from 47 patients to 99 patients, and was the best performing office in the company.

B.     Ms. Campbell loves hospice work, and desires to finish her career taking care of
the dying to help them end their lives in dignity and comfort, and to provide
emotional and spiritual support to them and their families.  As her [now former]
employer, Homestead Hospice, is a recipient of federal funding, Ms. Campbell
cannot continue her meaningful work as long as she is debarred by the U.S.
Government.

C.     Ms. Campbell is bound by and fully endorses Homestead Hospice's Statement of
Values, which includes the following: "**Integrity:** Adhering to the highest
standards of professionalism, ethics, and personal responsibility, we approach our
work with openness, transparency, decency, and humility."

D.     Ms. Campbell completed instruction required by Homestead Hospice, including
training in Corporate Compliance and Ethics on February 4, 2019, receiving a
grade of 100.

E.     Ms. Campbell is willing to enter into an Administrative Compliance Agreement
with GSA.  Ms. Campbell is not presently involved in government contracting or
subcontracting and has no intention of doing so in the future.  Thus, GSA does not
have the same public interest to protect as it would if Ms. Campbell were actively
involved in bidding on United States government procurement or had an intention
to re-enter that market.

52.     Ms. Drabkin responded to Mr. Pachter's January 31, 2020 email on February 2,
2020, noting that his email was received and she would "get back in touch with [him] shortly."

53.     Mr. Pachter sent an email to Ms. Drabkin on February 11, 2020, asking if there
was anything else he could do to facilitate GSA's review of his request.  Ms. Drabkin replied by

email the same day, noting that Mr. Mooney had resumed work on this matter, and he would respond to Mr. Pachter's email.

54.     On February 12, 2020, Mr. Mooney emailed Mr. Pachter stating that "We are in the process of reviewing your submission on behalf of Ms. Campbell.  At this point, there is nothing further required of you.  We will let you know if we have any further questions."

55.     On February 24, 2020, Mr. Pachter emailed Mr. Mooney, copying Acting SDO Schmidt and Ms. Drabkin.  Mr. Pachter requested a status update, noting "As previously stated, Ms. Campbell's employer informed her she will be terminated March 1 if this matter is not resolved."  Mr. Mooney did not respond to this email.

56.     On February 27, 2020, Mr. Pachter called and left a voicemail for Mr. Mooney, again requesting a status update.  Mr. Mooney did not respond to this voicemail.

57.     On March 2, 2020, Mr. Pachter emailed Mr. Mooney, copying Acting SDO Schmidt and Ms. Drabkin.  Mr. Pachter's email stated: "Jocelyn Campbell called this morning to say she has been terminated, as her employer stated would happen if her debarment was not resolved favorably by March 1.  Jocelyn is ineligible to work anywhere in the hospice industry as long as she is under this cloud.  As this matter has become urgent I ask that you act expeditiously, and I will appreciate your courtesy."  Mr. Mooney did not respond to this email.

58.     On March 3, 2020, Ms. Campbell emailed Mr. Mooney directly, copying Mr. Pachter, with the subject line "Letter of Personal Appeal for Jocelyn Campbell."  Ms. Campbell's email stated in full:

> Dear Mr. Mooney:
>
> My attorney has provided you facts regarding the investigation and now I will provide you with details of how this matter has and is personally affecting my entire family. Your investigation started in 2009, and I would be better off if I had served some type of prison sentence versus what I've been through personally, since this

investigation began. So, I am choosing to share with you the impact of the matter since I thought it was resolved in 2015 when I came to Washington, DC to speak with your team and never heard from you again until the compliance department of my former employer was doing routine background checks and found that my name was submitted on December 18th, 2019. Therefore, I am writing to speak on my own behalf regarding my name being listed in the SAM database as being 'ineligible" to participate in government-funded business which affects Medicare beneficiaries in the hospice industry.

Since 2015, I have been unable to find comparable employment to my experience and educational background. Employers repeatedly told me I was over-qualified even if I was willing to take a position just for the ability to work. Finally, worked seasonally at Macy's for Christmas. As a result, my daughter and I were left with no other option than to live with and be supported by my 75+-year-old mother on social security income.  Her social security check is less than $1400 a month. At one point, I was even forced to apply for public assistance in the form of food stamps and Medicaid for health insurance for my daughter. No one will ever imagine the psychological toll and the humility it took to be in this position for over two years. I had no money, no credit, and very little hope all because I made some poor decisions regarding the people I associated with early in my career. To keep from literally losing my mind during this period, I went back to school and obtained a Master's degree in Global Management.  With that degree came more student loans.  In July 2017, a friend of a friend made a call and I was offered a management position at Homestead Hospice. Not only was I now working back in one of my areas of educational expertise, but I now had sufficient income to care for my daughter, and I independent of my mother and the ability to now assist in her care.

Fast forward to 2020, the stability my job provided began a restoration process and reignited my passion for end-of-life care. Construction was my 'technical' work.  Hospice is work of the 'heart' and I thrive in it.  I truly believe this is my life's purpose. In the 90 days since this matter was discovered by the compliance department, my life has been turned upside down AGAIN….for this same matter.  I have been terminated and I don't have the ability to work for any hospice since it is regulated by the Office of the Inspector General and requires healthcare professionals background checks.  You may have heard that most people are one paycheck away from 'catastrophe'. I'm most people. I have been rebuilding my credit, paying my bills and I even managed to get

my daughter and me a home in the last two years. I am a middle-aged single mother with one income that now no longer exists.

My mother is now 82 and I am her primary caregiver.  My daughter is fourteen and in high school and needs all the stability she can get.  I am on the verge of a mental breakdown due to this pending matter.  So, if you don't care what happens to us, let me share the cost to our government.  I have an FHA loan on my home that will default because I no longer have the ability to pay my mortgage.  I have $140,000 in student loans that will default because I no longer have the ability to pay them. I will have to apply for Medicaid and public assistance for my daughter because I will not allow her to go without healthcare or food again.  Now, my mother, my daughter and I become causalities of a dysfunctional and untimely system.  I have no problem working hard and picking myself up from the bootstraps. I have done it. This time it's different. I don't have the mental strength to recover from this type of loss at this point. I am a productive law-abiding citizen and it seems that the government has a target on my back for the sake of 'having work to do".  If this is not the case, please explain to me why this matter is AGAIN cropping up eleven years later.

You asked me why I didn't have legal representation when you questioned me in 2015, I will remind you that I told you I truly believe in my heart that the government will do what it wants to do whether there is a ponderance of evidence or not. This is exactly what has happened.  Your organization sent a letter to the wrong address in Georgia (when you had my correct address because I met with your agent in Birmingham) and you have evidence that the letter wasn't received.  However, there was a default judgment and my name placed in SAM. I engaged an attorney this time to formally address follow your procedures for appeal to formally address the exclusion and you have ignored him. So, what was the point besides further diminishing my financial capacity to care for my family.

Yes, this is now an emotional appeal for you to address this matter immediately because I don't know what else to do. I don't know what else to do…

Regards,

Jocelyn Campbell

59.     Mr. Mooney responded to Ms. Campbell's email on March 3, 2020.  Mr. Mooney stated that "completely sympathize[d]" with Ms. Campbell's situation and that "I am personally doing everything in my power to expedite this matter and to bring about a resolution as quickly as I can; however, these matters require multiple levels of review on our end."

60.     On March 13, 2020, having heard nothing further from Mr. Mooney or others at GSA, Ms. Campbell emailed Mr. Mooney to request a status update.  Mr. Mooney did not respond to this email.

61.     On April 2, 2020, Mr. Pachter emailed Mr. Mooney again, copying Ms. Campbell and Acting SDO Schmidt.  Mr. Pachter noted that he had not seen a response to Ms. Campbell's March 13, 2020 email and noted "I have never experienced this kind of delay, especially in a matter as uncomplicated as this.  Your prompt reply will be appreciated."  Mr. Mooney did not respond to this email.

62.     On April 6, 2020, Mr. Pachter emailed Ms. Swaby in her new capacity as GSA Procurement Ombudsman, copying Acting SDO Schmidt, Mr. Mooney, and Ms. Campbell.  Mr. Pachter's email noted: "My application on behalf of Jocelyn Campbell for relief from debarment had been pending for an unusually long time even before the pandemic.  She is in a terrible situation, unable to find work.  In my experience, matters as simple as this, given the urgency, are typically resolved in a few days.  Now we are getting no response whatever."  Mr. Pachter concluded: "Absent your intervention, it appears our only recourse would be a court filing and we certainly want to avoid that if at all possible.  Anything you can do will be greatly appreciated."

63.     On April 7, 2020, Mr. Pachter received an email from Henry Swann, a Procurement Analyst at GSA's Office of the Procurement Ombudsman.  Mr. Swann referenced Mr. Pachter's email to Ms. Swaby and stated that "Ms. Swaby…has recused herself from this

matter regarding Ms. Jocelyn Campbell.  Therefore, I will be handling your inquiry."  Mr. Swann

further stated that he would "raise [Ms. Campbell's] concerns with the Suspension and

Debarment (S&D) program, and see what may be done to expedite her case."

64.     On April 13, 2020, Mr. Mooney emailed to Mr. Pachter a letter from SDO

Schmidt, titled "Notice of Continuation of Debarment of Jocelyn Campbell" ("Notice of

Continuation of Debarment").[2]  SDO Schmidt stated that he had received and reviewed the

January 31, 2020 Letter, the January 31, 2020 Campbell Declaration, and Ms. Campbell's email

dated March 3, 2020.

65.     The Notice of Continuation of Debarment noted that Mr. Arnold of the Seyfarth

firm had requested a delayed response to provide Ms. Campbell the opportunity to submit

information and argument specifying why she should be allowed to contract with the Federal

Government, and Mr. Mooney "granted Arnold's request for a delayed response."  Mr. Arnold

and Mr. Pachter understood that Mr. Mooney had given permission to respond to the Notice of

*Proposed* Debarment pursuant to FAR 9.406-3(b)(1), which requires an agency to "afford the

contractor (and any specifically named affiliates) an opportunity to submit…information and

argument in opposition to the proposed debarment."  SDO Schmidt nevertheless treated the

submissions as a request for a reduction in the period or extent of debarment in accordance with

FAR 9.406-4(c).  That FAR provision does not contain the due process protections afforded by

FAR 9.406-3.  Rather, it assumes the contractor or individual has been afforded those

protections, and it limits modification of an existing debarment for, e.g., "newly discovered

material evidence."  SDO Schmidt stated "After careful review of the administrative record and

---

[2] Mr. Schmidt was no longer Acting SDO for GSA.

your submissions, I have determined that your request does not meet the conditions under FAR 9.406-4(c) and that the Government's interest requires your continued debarment."

66.     On April 18, 2020, Mr. Pachter submitted to SDO Schmidt a letter requesting reconsideration of his decision to maintain Ms. Campbell's debarment ("First Request for Reconsideration").  In support of the First Request for Reconsideration, Mr. Pachter noted:

A.     Despite Mr. Mooney's agreement to treat the delayed submission (*i.e.*, the January 31, 2020 Letter) as a response to the proposed debarment, SDO Schmidt had instead treated the submission as a request to reduce the period or extent of debarment under the limitations of FAR 9.406-4(c).  However, even under that standard, SDO Schmidt had the discretion to relieve Ms. Campbell of the debarment sanction.

B.     Ms. Campbell had demonstrated that the grounds for proposed debarment lacked substance, and SDO Schmidt's decision did not question the validity of Ms. Campbell's response.

C.     In the Government's investigation of Motir and others, Ms. Campbell was a minor player.  GSA entered into an Administrative Agreement with Motir, Mr. Irono and his wife, and a Motir employee.  SDO Schmidt's April 13, 2020 letter did not suggest a reason why Ms. Campbell should be treated more severely than Motir and its principals.

D.     While there were substantial reasons for withdrawing Ms. Campbell's debarment entirely, Ms. Campbell was nevertheless willing to enter into a voluntary exclusion agreement, committing not to bid on government contracts for the period of her debarment.

E.      Ms. Campbell would be pleased to participate in a phone or video conference if

SDO Schmidt wished to assess her character personally.

67.     The First Request for Reconsideration further stated:

> Since I submitted my letter of January 31, 2020, the United States
> has entered the worst economic crisis since the Great Depression
> of the 1930s due to Covid-19.  Unemployment figures are
> staggering.  The Government is taking unprecedented steps to stem
> the suffering.  Ms. Campbell is an unemployed single mother with
> a 14-year-old daughter.  Ms. Campbell's own mother, 82, recently
> had a hip replacement and three blood transfusions.  She lacks
> mobility and the physical therapist states it will take some time to
> regain it.

68.     On April 22, 2020, Mr. Mooney sent Mr. Pachter an email, Subject: "2020 04 18

Jocelyn Campbell request for reconsideration – SDO Response."  Mr. Mooney's email included

five paragraphs constituting SDO Schmidt's response to the Request for Reconsideration

("Response to First Request for Reconsideration").

69.     In his Response, SDO Schmidt:

A.      Denied that GSA previously agreed Ms. Campbell's delayed submission would be

treated as a response to the proposed debarment, notwithstanding his statement in

the Notice of Continuation of Debarment that "[Integrity Officer] Mooney granted

Arnold's request for a delayed response;"

B.      Incorrectly asserted "there is no material difference as to whether the response

was for a proposed debarment or a debarment, because it is within my discretion

to terminate a debarment;" and,

C.      Stated that "After consideration of the latest April 18, 2020, request for

termination of Ms. Campbell's debarment, I reiterate my previous determination

not to terminate Ms. Campbell's debarment."

D.      Stated that "Should new information arise which was not already presented to me, regarding Ms. Campbell's present responsibility, I will consider another request from Ms. Campbell to terminate or reduce the period of her debarment, pursuant to Federal Acquisition Regulation 9.406-4(c)."

70.     On April 28, 2020, Ms. Campbell sent an email to SDO Schmidt, copying Mr. Mooney, Subject: "2020 04 28 Jocelyn Campbell_ Request for Reconsideration" ("Second Request for Reconsideration").  Referencing the April 22, 2020 SDO Response, Ms. Campbell stated she was responding "without counsel as I can no longer afford an attorney."[3]  Using the factors for reconsideration of debarment under FAR 9.406-4(c), Ms. Campbell noted:

A.      "**Newly discovered material evidence**: January 2020 new factual case information to support that there was no malicious, fraudulent or criminal intent associated with my actions.  At best, I operated out of 'ignorance' which was is (sic) still no excuse and I accept that.  You stated that it was still insufficient to determine my 'present responsibility.'  Therefore, if this submission isn't enough, can you please quantify/specify what you need to provide you with ability to evaluate my current position."

B.      "T³ Resources, Inc. the company I owned associated with this investigation is no longer in business and I personally have no intent to ever endeavor to do business in the executive contracting sector again."

C.      "If I had actually known I/my company was being considered by the government as actively and knowingly conducting any type of unethical or criminal behavior;

---

[3] Smith Pachter McWhorter PLC is representing Ms. Campbell *pro bono* in this judicial challenge.

I would have addressed the matter proactively.  I was simply made aware there

was an investigation for MOTIR in 2015."

71.     The Second Request for Reconsideration also directly contradicted many of the

factual allegations from the Notice of Proposed Debarment:

*"On May 6, 2015, you were interviewed by special agents from the FBI Birmingham field office*." **CLARIFICATION** (If I or my company was under investigation, no one notified me during this interview in Birmingham. Otherwise, I would have went to DC with counsel. I lived with my mom in Birmingham until July of 2017 when I moved to McDonough, GA for employment. So, I am unsure of how correspondence was mailed to my sister's rental property in Lithonia, Georgia.

*"You indicated that you created a fake contract between DSI and SECF based on the information Ray provided in order to get DSI's 8(a) status approved. You also told investigators that you fabricated another contract between DSI and Motir dated April 18, 2005 based on information provided by Ray indicating that Ray installed closed caption television monitors for Motir . You freely admitted that DSI could not have performed this work because DSI was not even created at the time, but Ray said he had performed this work and you did not ask for proof that the work had been done."* **CLARIFICATION:** Fake eludes to maliciousness and wrongdoing. Mr. Ray shared the projects were his personal past performance. He did the work and didn't have the documents to support his efforts. This is a challenge for many small businesses. I downloaded generic contracts from the internet and gave them to him to have them signed by the people he previously worked with. I had no financial interest or interest vested otherwise in Mr. Ray getting an SBA certification. I in no way benefited from this effort besides finding myself caught up in this investigation.

*"You noted that you had very limited knowledge about the White House contract as your work focused more on the construction side; you explained that you did not know why all three companies bid on the White House contract in 2009 and did not remember T3 being involved on that specific contract. You were not involved in writing the proposals for the White House contract, but did contribute to other contracts."* **CLARIFICATION:** There was a formally recognized mentor-protégé agreement recognized and approved by the SBA. According to their guidelines at the time, it was not illegal to share space, personnel or financial resources with

MOTIR. We had 'go-no go' procedures in place to determine if we
would pursue a project and therefore, it would not be necessary for
me to know every proposal submitted as our marketing person
would evaluate. My areas of expertise are construction and hospice.

"At some point in 2010 or 2011, you decided it was time to branch
out on your own, so you moved T3 to Bowie, Maryland and Rapp
ended up staying with Motir. After T3 separated from Motir, you
stopped transferring funds to Motir's bank accounts."
**CLARIFICATION:** Any funds transferred to MOTIR were for
documented subcontracts whereby work was legally subcontracted
to the company.

72.     On May 5, 2020, having received no response, Ms. Campbell re-sent her April 28,

2020 email to SDO Schmidt and Mr. Mooney, adding the phrase "KIND REMINDER" to the

Subject line.

73.     On May 27, 2020, SDO Schmidt responded to Ms. Campbell's April 28 and May

5, 2020 emails.  After recounting the prior correspondence regarding the debarment, SDO

Schmidt's sole response to Ms. Campbell was: "Thereafter, I received your independently

submitted email dated April 28, 2020.  After consideration of this submission, I have determined

that your request does not meet the conditions of FAR 9.406-4(c).  Accordingly, I find that your

submission is not sufficient to establish your present responsibility and I reiterate my previous

determination to continue your debarment until September 10, 2022.  At this time, GSA's

Suspension and Debarment Division considers this matter closed."

74.     The SDO's post-debarment actions again failed to comply with federal regulations

applicable to debarment by, *inter alia*:

A.     Failing to treat Mr. Pachter's and Ms. Campbell's January-March 2020

submissions as a delayed response to the Notice of Proposed Debarment.

B.     Failing to provide any explanation of the factual or legal bases for debarment;

C.     Failing to provide any substantive response to the information and argument submitted in opposition to debarment;

D.     Failing to acknowledge the existence of a genuine dispute of material fact;

E.     Failing to engage in fact-finding proceedings;

F.     Failing to issue written findings of fact;

G.     Failing to determine that the debarment was supported by a preponderance of the evidence;

H.     Failing to make any assessment of Ms. Campbell's present responsibility; and,

I.      Failing to provide any explanation of the factual or legal bases for rejecting the First and Second Requests for Reconsideration.

**GSA's Inconsistent Treatment of Plaintiff and Other Relevant Entities and Individuals**

75.     On the same day the SDO sent the Notice of Proposed Debarment of Ms. Campbell to an incorrect address, the SDO also sent notices of proposed debarment to Motir, Mr. Irono and his wife, and certain Motir employees (collectively "Motir and related individuals"). Upon information and belief, these notices of proposed debarment contained substantially the same factual assertions as the Notice of Proposed Debarment of Ms. Campbell.

76.     Three weeks later, on October 4, 2019, the SDO entered into an Administrative Compliance Agreement with Motir, Mr. Irono and his wife, and one Motir employee, withdrawing their proposed debarments in exchange for their commitment to comply with certain training, monitoring, and reporting obligations.

77.     On January 14, 2020, the Administrative Compliance Agreement was amended to add another Motir employee.

78.     The parties subject to the Administrative Compliance Agreement are free to bid on U.S. Government contracts and to participate in grants, financial assistance, and other non-procurement transactions.

79.     Unlike Motir and related individuals, the SDO did not provide an opportunity to Ms. Campbell to negotiate an Administrative Compliance Agreement.  Ms. Campbell offered, through her counsel, to enter into an Administrative Compliance Agreement.  She also offered, in exchange for the withdrawal of her debarment, to consent to a voluntary exclusion and not submit proposals or perform work on government contracts for the same period covered by her debarment.

80.     The allegations made by the SDO against Motir and related individuals implicated far more serious alleged wrongdoing than the allegations asserted against Ms. Campbell.

81.     The SDO has not explained why the alleged conduct of Ms. Campbell merits a harsher sanction than the alleged conduct of Motir and related individuals.  The sanction against Ms. Campbell appears to be a punitive measure resulting from her alleged failure to respond to the improperly addressed Notice of Proposed Debarment.

82.     The Government's disparate treatment of Ms. Campbell versus Motir and related individuals lacks any rational basis.

**The Irreparable Harm Caused by the Government's Unlawful Debarment**

83.     As a direct result of the Government's unlawful debarment, Ms. Campbell was terminated from her employment with Homestead Hospice.

84.     In the midst of the worst pandemic in more than a century, claiming the lives of more than 500,000 people worldwide and more than 125,000 Americans, Ms. Campbell is ineligible to work in her chosen field of hospice care for as long as she remains debarred.

85.     Ms. Campbell has been unable to obtain other employment to permit her to support herself, her 14-year-old daughter, and her elderly and infirm mother.

86.     Ms. Campbell's debarment has caused and will continue to cause irreparable harm to her reputation.

## COUNT I
### (Violation of the Administrative Procedure Act – All Defendants)

87.     Plaintiff realleges paragraphs 1-86 as if fully stated herein.

88.     The Debarment constitutes final agency action.

89.     The Debarment violates the Administrative Procedure Act because it is arbitrary, capricious, an abuse of agency discretion, unsupported by substantial evidence, and not in accordance with law and regulation.

**WHEREFORE**, Plaintiff respectfully requests that the Court:

A.     Issue a preliminary injunction setting aside the debarment pending a hearing on the merits, and schedule this matter for expeditious resolution;

B.     Permanently set aside the Debarment;

C.     Permanently enjoin the Government from debarring Ms. Campbell based on the conduct alleged in the Notice of Proposed Debarment;

D.     Award Ms. Campbell reasonable attorneys' fees and costs; and

E.     Grant such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ John S. Pachter
John S. Pachter (D.C. Bar No. 12005)
Ashley N. Barbera Amen (*pro hac vice application to be submitted*)
SMITH PACHTER MCWHORTER PLC
8000 Towers Crescent Drive, Suite 900
Tysons Corner, VA 22182

Tel:     (703) 847-6300
Fax:     (703) 847-6312
JPachter@smithpachter.com
AAmen@smithpachter.com
*Attorneys for Jocelyn Dionne Campbell*

June 30, 2020