## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JOCELYN DIONNE CAMPBELL**, <br><br> Plaintiff, <br><br> v. <br><br> **WILLIAM S. SCHMIDT,** in his official capacity as the Suspension and Debarment Official, Suspension & Debarment Division of the U.S. General Services Administration, *et al.*, <br><br> Defendants. | Case No. 1:20-cv-1785 (CRC) |

### <u>MEMORANDUM OPINION</u>

Plaintiff Jocelyn Campbell was debarred—that is, banned from contracting with the federal government—by the U.S. General Services Administration ("GSA"), and therefore lost her management job at a hospice that accepts federal reimbursement.  Ms. Campbell sued GSA and two of its officials, claiming that her debarment violated the Administrative Procedure Act ("APA").  She moved for a preliminary injunction lifting her debarment during this litigation.

The record before the Court does not justify a preliminary injunction.  Campbell has not demonstrated that she will likely succeed in proving that her debarment was unlawful in any respect.  Nor has she carried her heavy burden to show that she faces irreparable harm in the absence of preliminary relief.  On the contrary, a preliminary injunction would disserve the public interest by undermining the government's ability to debar contractors who have been duly found to lack responsibility to conduct business with federal agencies.  The Court will therefore deny the preliminary injunction motion.

I.    **Background**

A.  <u>The Debarment Process</u>

The Federal Acquisition Regulation ("FAR") requires federal agencies to contract only with "responsible contractors."  48 C.F.R. § 9.402(a).  "[T]o protect the Government's interest" in avoiding irresponsible contractors, an agency may debar a contractor after following debarment procedures that comply with the FAR.  <u>Id.</u> § 9.402(b).  Debarment must be used "only in the public interest . . . and not for purposes of punishment."  <u>Id.</u>  The FAR advises agencies that a contractor's debarment generally should last three years or less.  <u>Id.</u> § 9.406-4(a)(1).

Before debarring a contractor, the government must send the contractor a notice, which must state the reasons for the proposed debarment and offer the contractor an opportunity to respond within 30 days.  <u>Id.</u> § 9.406-3(c).  If the contractor's response raises disputes as to material facts, the government must provide an opportunity for a trial-like hearing and prepare written findings of fact before deciding whether to debar the contractor.  <u>Id.</u> § 9.406-3(b)(2), (d)(2)(i).  If no material disputed facts are raised, the debarring official simply considers the whole administrative record and decides based on the preponderance of the evidence (or, if applicable, a conviction or civil judgment that warrants debarment).  <u>Id.</u> § 9.406-3(d)(1), (3).  After being debarred, a contractor may ask the agency to terminate the debarment early.  The agency has discretion to grant such post-debarment relief for "reasons the debarring official deems appropriate."  <u>Id.</u> § 9.406-4(c)(5).

GSA has established procedures for debarring contractors within its purview, which covers a broad range of federal acquisitions including construction contracts.  <u>See id.</u> § 509.401(a).  The Suspension and Debarment Official ("SDO") of GSA—currently defendant William Schmidt—is responsible for providing notice of proposed debarments and conducting

debarment proceedings in keeping with the FAR.  Id. §§ 509.403, 509.406-3.  Once debarred by GSA, a contractor generally may not bid on contracts with any part of the executive branch until the debarment is lifted.  Id. § 9.406-1(c).

B. Facts

The following facts are drawn from the record before the Court and are undisputed for purposes of the present preliminary injunction motion.  Campbell formed a small business called T3 Resources, Inc. ("T3") in 2003.  First Campbell Decl. ¶ 2, ECF No. 3-3.  T3 initially focused on construction projects for churches.  Id.  T3 was eventually certified under Section 8(a) of the Small Business Act, 15 U.S.C. § 637(a), which seeks to promote contracting between the federal government and disadvantaged small businesses.  First Campbell Decl. ¶ 2.  In 2006, T3 entered a formal mentoring relationship, becoming a protégé of Motir Services, Inc. ("Motir"), an established 8(a) business owned by Emmanuel Irono.  Id. ¶¶ 3, 6.  The Small Business Administration approved that mentor/protégé relationship.  Id. ¶ 3.  T3 then began contracting with the federal government, in addition to commercial and municipal clients.  Id. ¶ 4.  T3's business operations ended in 2011.  Id. ¶ 5.

Campbell subsequently moved to Nigeria, where she conducted business with the Nigerian government through an entity she owned.  Pachter Email (Sept. 2, 2020) at 1, ECF No. 15-2.  While living abroad, Campbell used a temporary mailing address in Lithonia, Georgia.  First Campbell Decl. ¶ 9.

In 2015, while Campbell was in Nigeria, the FBI contacted her to request an interview as part of an investigation it was conducting into Motir and Mr. Irono.  Id. ¶ 6.  About two months later, Campbell moved to Birmingham, Alabama, where she would live with her mother until 2017.  Id. ¶ 7.  Campbell participated in the requested interview at the FBI's Birmingham office

3

in May 2015.  Id.  According to Campbell, the FBI was aware of the Birmingham address where she was living at the time.  Id.

In 2017, Campbell began working as an administrator at Homestead Hospice in Jackson, Georgia.  Pachter Decl. Ex. C at JC0007 ¶ 3, ECF No. 3-2.  She says she was successful in that job and found personal satisfaction in it.  Id. at JC0007 ¶¶ 3-4.  In August 2019, while working at Homestead, Campbell incorporated a new company, The Lighthouse Community Hospice, Inc. Second Campbell Decl. ¶ 3, ECF No. 18.

On September 11, 2019, GSA issued a Notice of Proposed Debarment ("Proposal") as to Campbell.  Proposal, ECF No. 12-3.  According to the Proposal, the FBI's investigation revealed that Motir, T3, and a third company, Dimensional Solutions, Inc. ("DSI"), improperly coordinated government-contract bids without informing the government that they were affiliated.  See Proposal 5, 8, 10.  The Proposal states that in her FBI interview, Campbell admitted that in connection with DSI's effort to become an 8(a) certified business, she created fake contracts between DSI and other entities, dating to before DSI existed.  Id. at 10.  Campbell also reportedly admitted to the FBI that she told a colleague to create T3 resumes for Motir employees so T3 could appear to have a larger staff when bidding on government contracts.  Id. at 9.

GSA sent the Proposal to the Lithonia, Georgia address that Campbell had used while in Nigeria.  First Campbell Decl. ¶ 9.  Neither Campbell nor her family lived at the Lithonia address at the time, so she did not receive the Proposal.  Id.  The Proposal was returned to GSA as unclaimed.  Unclaimed Mail Notice, ECF No. 12-5.

On December 18, 2019, GSA sent a final Notice of Debarment to the Lithonia address. Debarment Notice, ECF No. 12-4.  The Debarment Notice, signed by then-acting SDO Schmidt,

refers to the Proposal and acknowledges that GSA received notice that the Proposal was

unclaimed.  Id.  It then states: "After careful consideration of the information contained in the

record in this matter, I have determined that cause for your debarment exists pursuant to Federal

Acquisition Regulation (FAR) 9.406-2(c) and that the Government's interest requires your

debarment."  Id.  Campbell was accordingly debarred for a three-year term.  Id.  As with the

Proposal, Campbell did not receive the Debarment Notice.  First Campbell Decl. ¶ 12.

Later in December 2019, Campbell learned that she had been debarred after Homestead

discovered the debarment in a routine check of the government's online System for Award

Management.  Homestead told Campbell that she would be terminated unless the debarment was

lifted by March 1, 2020.  Id.

On January 6, 2020, Campbell's then attorney Edward Arnold spoke by telephone with

GSA Integrity Officer Dylan Mooney.  Mr. Arnold then emailed Mr. Mooney: "I will be

representing Jocelyn Campbell, who I understand has been debarred. We intend to prepare and

submit a response to the debarment in an expeditious manner."  Arnold Emails at 3, ECF No. 12-

6. On January 21, Arnold again spoke with Mooney.  According to GSA's later account of the

January 21 call, "Arnold requested a delayed response deadline to provide [Campbell] the

opportunity to submit information and argument specifying why [she] should be allowed to

contract with the Federal Government. . . . Mooney granted Arnold's request for a delayed

response."  Continuation Notice, ECF No. 12-12.

Campbell subsequently retained a new attorney, John Pachter.  On January 31, Mr.

Pachter sent a letter to GSA requesting relief from Campbell's debarment.  Pachter Letter (Jan.

31, 2020), ECF No. 12-7.  In a declaration attached to this letter, Campbell responded to the

Proposal's "insinuations of wrongdoing in T3's relationship with Motir."  Pachter Decl. Ex. C at

JC0008 ¶ 9.  Campbell admitted that she helped DSI gain its 8(a) certification—specifically, she "downloaded contract forms from the web and entered information" she received from DSI founder Anthony Ray.  Id.  But she disputed the language the Proposal used to characterize this conduct: "I did not 'create' a 'fake contract between DSI and [a third party]' nor did I 'fabricate' another contract between DSI and Motir."  Id.  Campbell further stated that "[t]he subcontracting relationship between Motir and T3 was not a secret," that the approved mentor/protégé relationship allowed Motir and T3 to share employees, and that such sharing "was the norm" in the field.  Id.  She also described her success as a hospice administrator, affirmed her commitment to integrity, and reported receiving a perfect score on a recent ethics test.  Id. at JC0007-08 ¶¶ 3-4, 10-11.

In early March, Homestead fired Campbell because her debarment was still in place. Pachter Email (March 2, 2020), ECF No. 12-10.  The next day, Campbell personally emailed Mooney to ask for relief, explaining that the debarment had caused her emotional and financial distress.  Campbell Email, ECF No. 12-11.

According to Campbell, she filed "approximately 10-12" applications for other jobs with hospices and other medical providers, but all failed.  Second Campbell Decl. ¶ 5.  She then "decided to focus [her] efforts on developing Lighthouse but providing hospice services at no charge and without receiving a salary, hoping the debarment would be lifted and [she] would then be able to operate Lighthouse as a going concern."  Id. ¶ 6.  Lighthouse is now serving patients but—because of Campbell's debarment, in her telling—has not sought or received any payment from Medicare, Medicaid, private insurers, or patients.  Id. ¶ 8.  Instead, Campbell attests that she has funded Lighthouse by liquidating her 401k, withdrawing her savings, borrowing from friends and family, and successfully applying for two federal loans totaling

$40,000.  Id. ¶¶ 9-12.  Campbell represents that Lighthouse will shut down if the debarment stays in place.  Id. ¶ 13.

Unfortunately for Campbell, her plan to jump-start Lighthouse's revenue by getting her debarment lifted has not panned out so far.  On April 13, 2020, GSA sent Campbell a Notice of Continuation of Debarment.  Continuation Notice, ECF No. 12-12.  The Continuation Notice states that, "[a]fter careful review of the administrative record and [Campbell's] submissions," SDO Schmidt determined that her request did not meet the conditions for post-debarment relief under 48 C.F.R. § 9.406-4(c).  Id.  The notice provides no further reasoning to support this conclusion.

Pachter asked GSA to reconsider the Continuation Notice, taking issue with Schmidt's framing of Campbell's request as an application for post-debarment relief under § 9.406-4(c). According to Pachter, "Mr. Arnold understood from his conversations with Mr. Mooney that Ms. Campbell's delayed submission would be treated as a response to the proposed debarment," meaning it would be afforded the pre-debarment process set forth in § 9.406-3.  Pachter Letter (Apr. 18, 2020) at 1, ECF No. 12-13.  Pachter also conveyed that Campbell was willing to enter an administrative compliance agreement excluding her from federal contracting, if GSA would then lift the debarment.  Id. at 2.  He noted that GSA had entered such agreements with Motir, Irono, and other participants in the same alleged conspiracy.  Id. at 1.

Schmidt denied the request for reconsideration.  Schmidt Email (Apr. 22, 2020), ECF No. 12-14.  He disputed the contention that Mooney had agreed to treat Cambell's submission as if it were filed as a pre-debarment response to the Proposal, but he stated that the procedural framing made no difference because he "evaluated her submission with the same consideration as if she had submitted a timely response to her proposed debarment."  Id.  Schmidt found that

7

submission "insufficient to establish Ms. Campbell's present responsibility" but did not elaborate on his reasoning.  Id.  After further correspondence, GSA reiterated its conclusion yet again, still without substantive written analysis.  Schmidt Letter (May 27, 2020), ECF No. 12-16.

      C.  Proceedings in this Case

Campbell filed this action in June 2020, asking the Court to set aside the debarment under the APA.  Compl. 31.  Shortly thereafter, she filed the present Motion for Preliminary Injunction, seeking an order temporarily enjoining enforcement of the debarment and requiring the government to remove her name from its online list of excluded contractors.  Mot. for Prelim. Injunction 1.  Campbell's Complaint, her memorandum in support of her preliminary injunction motion, and the supporting exhibits contained no indication that Campbell had founded Lighthouse and was managing the new hospice without pay.  On the contrary, Campbell represented—without qualification, and under penalty of perjury—that she was "ineligible to work in the field of hospice care."  First Campbell Decl. ¶ 20.

The government filed an opposition to the motion, and Campbell filed a reply, still making no mention of Lighthouse.  The Court then held a hearing on the motion in August 2020. At the conclusion of the hearing, the Court urged GSA to consider whether it wished to explore a potential administrative agreement resolving Campbell's debarment, and directed the government to then file a notice indicating whether the Court should proceed to rule on the preliminary injunction motion.  Hearing Tr. 47-48; see also Minute Order (Aug. 28, 2020).

A week later, the government informed the Court that it had "identified information suggesting that Plaintiff may be currently working in the hospice field and, moreover, serving as an officer of a company that is receiving federal funds."  Defs.' Notice 1-2, ECF No. 15. Campbell then filed a supplemental declaration, disclosing her involvement in Lighthouse and

confirming that the new hospice had received two federal loans, but stating that the loan applications did not ask about debarment.  Second Campbell Decl. ¶¶ 3-11.  The government responded by asking the Court to proceed with the preliminary injunction motion and arguing that the record, including Campbell's supplemental declaration, failed to show that she was suffering irreparable injury.  Defs.' Notice, ECF No. 17; Defs.' Response to Pl.'s Suppl. Decl., ECF No. 19.  Campbell submitted a reply addressing her irreparable-harm argument.  She also attached another supplemental declaration, retracting her previous representation that the federal loan applications she submitted for Lighthouse did not ask about debarment.  Third Campbell Decl. ¶ 2, ECF No. 21-1.

The preliminary injunction motion is now ripe for decision.

## II.    Legal Standards

### A.    Motion for Preliminary Injunction

"A preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004).  To obtain a preliminary injunction, the moving party must show: (1) that she is likely to succeed on the merits of his claim; (2) that she is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in her favor; and (4) that a preliminary injunction is in the public interest.  Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008).  An absence of irreparable injury is fatal to a preliminary injunction motion.  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  The D.C. Circuit has suggested, without holding, that failure to establish a likelihood of success on the merits also categorically forecloses preliminary relief.  Sherley v. Sebelius, 644 F.3d 388, 393 (D.C. Cir. 2011).

B.  Judicial Review of Debarment

An agency's decision to debar a contractor is subject to review under "the traditional 'arbitrary and capricious' standard set forth in the APA." Kisser v. Cisneros, 14 F.3d 615, 618 (D.C. Cir. 1994).  Generally, this standard is "highly deferential" to the agency and turns on an assessment of "whether the agency has articulated a rational connection between the facts found and the choice made." Id. at 618-19 (internal quotation marks omitted).  Thus, when a debarred contractor attacks the substantive reasoning the agency gave for a debarment, the court will uphold the debarment unless "the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment." Id. at 619.  Similarly, if the agency makes a fact-specific determination that the circumstances in a debarment proceeding do not trigger a particular procedural requirement, judicial review of that determination is deferential. See Waterhouse v. United States, 874 F. Supp. 5, 9 (D.D.C. 1994) (reviewing for abuse of discretion agency's determination that there was no genuine issue of material fact and thus no need for a formal evidentiary hearing).

Judicial review becomes less deferential when the dispute concerns legal questions about the meaning of the FAR's procedural provisions. See Friedler v. GSA, 271 F. Supp. 3d 40, 52-53 (D.D.C. 2017) ("[O]nly minimal deference is due to GSA's interpretation of the FAR when a court undertakes to determine whether the agency followed that regulation's procedural requirements prior to imposing a debarment."); Caiola v. Carrol, 851 F.2d 395, 399 (D.C. Cir. 1988) (noting that several agencies together promulgated the FAR, which "weaken[s] the case for deference" to any single agency's interpretation of the FAR).  A legal error that deprives the contractor of procedures required by the FAR may render the debarment "arbitrary and capricious as a matter of law." Friedler, 271 F. Supp. 3d at 53.

### III.  Analysis

A.  <u>Likelihood of Success on the Merits</u>

Campbell argues that she is likely to succeed on the merits because her debarment suffers from seven separate defects.  The Court will separately address each of these theories of error.  After careful consideration, the Court is not persuaded that any of Campbell's arguments is likely to carry the day.  Taken as a whole, the record before the Court tends to show that GSA properly debarred Campbell, then acted within its discretion to deny post-debarment relief.  Campbell therefore is not likely to succeed on the merits.

> *1.  Was the Proposal procedurally improper because it was sent to the wrong*
> *address and not received?*

Campbell first argues that GSA failed to satisfy the FAR's procedural notice requirements.  Pl.'s Mem. 20-22; Reply 14-15, ECF No. 13.  Specifically, Campbell claims that (1) GSA failed to send the Proposal to her last known address and (2) because she did not receive the mailing, she was not provided the opportunity to respond that the FAR contemplates.  Reply 14-15.  The Court disagrees on both counts.

<u>First</u>, Campbell fails to show that GSA acted improperly by mailing the Proposal to her former Lithonia, Georgia address in the first instance.  A GSA regulation requires the agency to send a notice of proposed debarment "by certified mail, return receipt requested, to the last known address of a party, its counsel, or agent for service of process."  48 C.F.R. § 509.403.  GSA asserts that it complied with this regulation by sending the Proposal to the Lithonia address, which was Campbell's most recent address known to GSA.  Opp. 14-15.  Campbell offers no evidence that anyone at GSA had actual knowledge of a more recent address, but states that she informed the *FBI* of her then-current Birmingham address in 2015.  First Campbell Decl. ¶ 7.  She argues that because GSA knew that the FBI had interviewed her in Birmingham, GSA

should have exercised "[a] higher level of diligence" to determine whether she had a more recent Birmingham address before sending the Proposal to Lithonia.  Pl.'s Mem. 21.

This argument is unpersuasive.  Without evidence that the Birmingham address was actually known to GSA, the Court cannot impute that knowledge from the FBI to GSA.  "[T]he U.S. Government is not a monolith, and notice to one agency of the Government . . . is not notice to another government agency."  Estate of Clarke v. Comm'r, 54 T.C. 1149, 1169 (1970); see also Luhring v. Glotzbach, 304 F.2d 556, 559 (4th Cir. 1962) (IRS agents in Virginia properly sent notice to taxpayers' last address known to them, although IRS agents in Florida knew of a more recent address); DiViaio v. Comm'r, 539 F.2d 231, 235 n.11 (D.C. Cir. 1976) (distinguishing Luhring but agreeing that the relevant IRS office there "had no notice and did not know of any change in address").  No statute or regulation requires GSA to engage in inter-agency consultation—with all the attendant administrative burdens and delays—to confirm a contractor's last known address when sending a notice of proposed debarment.  Arguably, once the Proposal was returned to GSA as unclaimed, the better policy might have been for the agency to conduct a limited search for a more recent address.  But the Court does not sit in judgment of GSA's policy choices.  Regardless of whether it should have done more, GSA likely complied with its "last known address" regulation as written.

Second, Campbell's argument that she did not receive the Proposal also fails to establish that the debarment was procedurally invalid.  The FAR requires that a notice of proposed debarment inform the contractor "[t]hat within 30 days after *receipt* of the notice, the contractor may submit, in person, in writing, or through a representative, information and argument in opposition to the proposed debarment[.]"  48 C.F.R. § 9.406-3(c)(4) (emphasis added).  While GSA sends notices of proposed debarment by certified mail, return receipt requested, see 48

C.F.R. § 509.403, it also recognizes that situations may arise where GSA does not promptly receive a return receipt and therefore cannot be certain whether the contractor received the letter. GSA's regulation therefore provides that "[i]f no return receipt is received within 10 calendar days of mailing, receipt will then be presumed." Id. This regulation, together with the FAR, means that GSA generally may consider a debarment uncontested if it receives no return receipt and hears nothing from the contractor within 40 days of mailing the proposal.

Campbell does not challenge the validity of this GSA regulation.[1]  Instead she argues, in effect, that the presumption of receipt was rebutted here because the Proposal was returned unclaimed, so GSA must have known it was not received.  Hearing Tr. 8-9; Reply 15.  In evaluating this argument, the Court may not substitute its judgment for GSA's, but must determine whether GSA abused its discretion by failing to conclude that the unclaimed mail overcame the presumption of receipt.  See Waterhouse, 874 F. Supp. at 9.

Campbell does not meet this high standard.  The problem with Campbell's argument is that an unclaimed mail notice does not conclusively prove that the Proposal was not received. Rather, the fact that certified mail was returned as unclaimed "leav[es] unsettled whether the addressee refused to accept the certified letter[,] just happened to be out when delivery was attempted," or had moved to a new address.  Derezinski v. Mukasey, 516 F.3d 619, 621 (7th Cir.

---

[1] Although Campbell does not raise the point, the Court has considered whether GSA's adoption of this ten-day presumption is inconsistent with 48 C.F.R. § 9.406-3(c)(4).  It is not. Section 9.406-3(c)(4) provides that "receipt" of the notice of proposed debarment starts that 30-day clock for the contractor's response.  Section 509.403 addresses a different question: how to determine, without conclusive evidence, when (or whether) receipt occurred.  Of course, the ten-day presumption may sometimes cause GSA to conclude incorrectly that a proposal was received—but that is simply how evidentiary presumptions work.  By the same token, the presumption of innocence in criminal cases may cause some guilty defendants to be acquitted, but that does not make it inconsistent with the underlying penal law.

2008).[2]  A contractor who willfully refused to accept certified mail from GSA would surely have "received" the mail within the meaning of the FAR.  Cf. Derezinski, 516 F.3d at 620 (physical receipt of mail and evasion of delivery "would amount to the same thing").  Yet, certified mail sent to such a contractor would likely be returned as unclaimed.  If GSA were compelled to conclude that every piece of mail returned as unclaimed was never received by the addressee, then any contractor hoping to avoid debarment would have a strong incentive to evade delivery of GSA's letters and thus avoid starting the 30-day clock for a response in opposition to debarment.  The Court therefore cannot say that it was impermissible for GSA to apply the presumption of receipt to the Proposal—even though it now appears that Campbell did not evade delivery of the Proposal but genuinely did not receive it.  First Campbell Decl. ¶ 10.

All told, it appears on the present record that GSA complied with its procedural obligations in providing notice of Campbell's proposed debarment.  Therefore, it likely was procedurally proper for GSA to finalize the debarment after waiting more than 40 days from the mailing of the Proposal.

### 2. Did the text of the Proposal fail to provide adequate notice of the basis for the proposed debarment?

In addition to her procedural objections to the Proposal, Campbell mounts substantive ones.  She claims that the Proposal provides inadequate notice of the reasons for the proposed debarment because only two pages of the twelve-page Proposal describe Campbell's own alleged

---

[2] Campbell cites Riley & Ephriam Construction Co., Inc. v. United States, 408 F.3d 1369 (Fed. Cir. 2005) in support of her argument that GSA failed to provide 30 days from receipt of the Proposal to respond.  Reply 15.  In Riley & Ephriam, the government moved for summary judgment and bore the burden to prove that a notice was received by a certain date.  408 F.3d at 1372.  The government failed to carry that burden because it had no proof of receipt.  Id. at 1374. Here, by contrast, Campbell bears the burden to prove that the Proposal was *not* received, and that GSA abused its discretion by failing to so conclude.

conduct, while eight describe the conduct of other parties.  Pl.'s Mem. 22-23.  She also contends that the Proposal fails to explain why her own alleged conduct was "of so serious or compelling a nature that it affects [her] present responsibility."  Id. at 23-24 (quoting 48 C.F.R. § 9.406-2(c)).

These arguments are weak.  The FAR requires a notice of proposed debarment to advise the contractor of "the reasons for the proposed debarment in terms sufficient to put the contractor on notice of the conduct or transaction(s) upon which it is based."  48 C.F.R. § 9.406-3(c)(2).  The Proposal does precisely that.  It alleges that in her FBI interview, Campbell admitted to, *inter alia*, creating fake contracts to supply DSI with the necessary "experience" to qualify for 8(a) certification and directing a colleague to create T3 resumes for Motir employees so that T3 would appear larger to the government.  Proposal 9-10.  These are consequential allegations.  It hardly requires elaboration why these actions, if proven and not counterbalanced by mitigating circumstances, could reasonably be considered "so serious" as to affect Campbell's "present responsibility" to contract with the government.  48 C.F.R. § 9.406-2(c).

That the description of Campbell's alleged wrongdoing is contained within a longer factual narrative is irrelevant.  The Proposal's recitation of the alleged actions of Irono, Motir, and others does not detract from the clarity of its allegations against Campbell.  On the contrary, the background information is helpful to a reader's understanding of Campbell's alleged misconduct.

Campbell therefore is not likely to succeed on her claim that the text of the Proposal provides inadequate notice of the grounds for her proposed debarment.

3. *Did the Debarment Notice fail to specify the reasons for debarment or determine that the cause for debarment was established by a preponderance of the evidence?*

Next, Campbell argues that the Debarment Notice failed to articulate a "reasoned determination," clarify whether GSA was imputing others' conduct to her, and explain why the cause for debarment was supported by a preponderance of the evidence.  Pl.'s Mem. 25-27.  These arguments are not likely to succeed, given the substantial deference the Court owes GSA.

A final debarment notice must "[r]efer[] to the notice of proposed debarment" and "[s]pecify[] the reasons for debarment."  48 C.F.R. § 9.406-3(e)(1).  The debarment must also be based on a preponderance of the evidence.  48 C.F.R. § 9.406-3(d)(3).  Review of whether a debarment satisfies these requirements is "highly deferential."  Kisser, 14 F.3d at 618.  "Even if the [d]ecision was 'of less than ideal clarity,' the court must nonetheless uphold it 'if the agency's path may reasonably be discerned.'"  Burke v. EPA, 127 F. Supp. 2d 235, 242 (D.D.C. 2001) (quoting Bowman Transp., Inc. v. Arkansas Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)).

Here, the Debarment Notice refers to the Proposal, then states that "[a]fter careful consideration of the information contained in the record in this matter," GSA "determined that cause for [Campbell's] debarment exists pursuant to [48 C.F.R. §] 9.406-2(c) and that the Government's interest requires [her] debarment."  From this, it "may reasonably be discerned," Burke, 127 F. Supp. 2d at 242, that GSA debarred Campbell because the misconduct she allegedly admitted to the FBI, as described in the Proposal, was "of so serious or compelling a nature that it affects [her] present responsibility."  48 C.F.R. § 9.406-2(c).  Moreover, the Court can discern that GSA did not reach this conclusion by imputing others' conduct to Campbell.  As discussed above, the Proposal clearly uses background information about Campbell's associates to put her admissions in context, not to accuse her of guilt by association.  This understanding of

16

the Proposal carries over to the Debarment Notice, which refers to the Proposal and implicitly incorporates its factual narrative.

As Campbell points out, the Debarment Notice does not explicitly rule out the possibility that in addition to considering the information in the Proposal, GSA might have also considered other, unspecified "information contained in the record."  Pl.'s Mem. 25.  But this merely shows that the Debarment Notice was "of less than ideal clarity," not that it was arbitrary and capricious.  Burke, 127 F. Supp. 2d at 242.  Importantly, any reasonable reader of the Debarment Notice would understand that the information in the Proposal about Campbell's alleged conduct was at least *one* reason for GSA's conclusion, if not the sole reason.  Cf. Casino Airlines, Inc. v. NTSB, 439 F.3d 715, 718 (D.C. Cir. 2006) (upholding agency decision where agency's "language could have been more direct," but any "fair reading" would reveal that the agency based its decision "at least in part" on a specific ground).

Campbell's argument that the Debarment Notice fails to establish the cause for debarment by a preponderance of the evidence fares no better.  The Debarment Notice and the Proposal indicate that GSA's fact-finding analysis was straightforward; the agency simply credited the information from Campbell's FBI interview.  There is no indication that GSA had before it any countervailing evidence to weigh against the FBI interview at the time.  Under these circumstances, it would be an empty formality for GSA to recite the obvious conclusion that its factual findings were supported by a preponderance of the evidence.  Campbell cites no authority that compels GSA to include these magic words in the Debarment Notice.

### 4. Did GSA fail to assess Campbell's present responsibility and consider mitigating factors?

Campbell also claims that her debarment is invalid because GSA failed to consider mitigating factors and thus make an informed assessment of her present responsibility.  Pl.'s

Mem. 31.  She does not carry her burden to show a likelihood of success on this claim because, on the record before the Court, it appears most likely that GSA no longer had an obligation to analyze mitigating factors in writing by the time Campbell presented them to the agency.

A debarring official "act[s] in an arbitrary and capricious manner" if the debarment decision "fail[s] to explain why he did not find the mitigating evidence presented by the [contractor] persuasive."  Feinerman v. Bernardi, 558 F. Supp. 2d 36, 50 (D.D.C. 2008); see also Robinson v. Cheney, 876 F.2d 152, 160 (D.C. Cir. 1989) ("Affording the contractor this opportunity to overcome a blemished past assures that the agency will impose debarment only in order to protect the Government's proprietary interest and not for the purpose of punishment."); 48 C.F.R. § 9.406-1(a) (listing potential mitigating factors that a debarring official "should consider" before debarring a contractor).

However, none of Campbell's authorities suggests that when a contractor submits mitigating factors *after* being debarred, the agency still must analyze those factors in writing. Rather, the FAR seems to contemplate that a request to terminate an already-issued debarment based on mitigating factors is a matter within the debarring agency's broad discretion.  In contrast to the FAR's detailed pre-debarment procedural requirements, the regulation provides merely that "[t]he debarring official *may*" grant an early termination of debarment based on certain enumerated grounds.  48 C.F.R. § 9.406-4(c) (emphasis added).  The FAR's list of potential reasons for post-debarment relief does not specifically mention mitigating factors, but grants discretion to consider any "[o]ther reasons the debarring official *deems* appropriate."  Id. (emphasis added).  In the absence of further guidance about when the debarring official should "deem[]" post-debarment relief "appropriate," this language suggests that the denial of a request to terminate a debarment based on mitigating factors is either committed to the agency's

unreviewable discretion or subject only to exceedingly narrow judicial review.  Cf. Webster v.
Doe, 486 U.S. 592, 600 (1988) (statutory language authorizing CIA Director to terminate
employees whenever he "shall deem such termination necessary or advisable in the interests of
the United States" commits termination to unreviewable agency discretion and "exudes
deference to the Director").

Therefore, before reaching the issue of whether GSA properly analyzed the mitigating
factors highlighted in Campbell's January 2020 submission to the agency, the Court must
address the threshold question of what posture the proceeding was in when Campbell made that
submission.  If Campbell's submission was properly regarded as a request for post-debarment
relief under 48 C.F.R. § 9.406-4(c), then GSA had no apparent obligation to analyze it in any
detail.  By contrast, if GSA agreed to treat the submission as a response to the Proposal under the
rules that normally apply *before* debarment, then GSA was obliged to analyze mitigating factors.

The parties dispute whether GSA agreed to treat the January 2020 submission like a pre-
debarment response, and there is some evidence to support both views.  Campbell's best
evidence is GSA's statement in an April 2020 letter that it had "granted Arnold's request for a
delayed response."  Continuation Notice, ECF No. 12-12.  According to Campbell, the "delayed
response" referenced in this letter must be a delayed response to the Proposal, since there is no
deadline for a response to a final debarment.  Pl.'s Mem. 29.  On the other side, there is
evidence, spanning several months, that both Arnold and GSA understood Campbell to be
seeking post-debarment relief under 48 C.F.R. § 9.406-4(c).  See Arnold Emails at 3, ECF No.
12-6 ("I will be representing Jocelyn Campbell, who I understand *has been debarred*.  We intend
to prepare and submit a response *to the debarment* in an expeditious manner." (emphases
added)); Schmidt Email (Apr. 22, 2020) (disputing the "assumption" that "Ms. Campbell's

delayed submission would be treated as a response to the proposed debarment"); Continuation Notice (applying § 9.406-4(c) to deny relief from debarment). Moreover, GSA apparently did not lift the debarment while it was considering Campbell's submission, as might be expected if the agency had intended to put Campbell back in the position of a *proposed* debarree.

After weighing this evidence, the Court is not persuaded that Campbell has carried her burden to show that GSA agreed to treat the January 2020 submission like a pre-debarment response and thus took on an obligation to analyze mitigating factors. The most plausible inference is that GSA used the phrase "delayed response" loosely, without intending to waive any specific filing deadline. The agency probably meant only to assure Arnold that it would accept and review Campbell's post-debarment request for § 9.406-4(c) relief.

Accordingly, Campbell is not likely to succeed in showing that GSA violated the APA by failing to analyze the mitigating factors she presented in 2020, after she had been debarred. The Court does not reach the question of whether Campbell would likely succeed on this claim if her submission to GSA had been filed in a pre-debarment posture.

> 5. *Did GSA violate the FAR by failing to hold a hearing and prepare written findings of fact?*

Relatedly, Campbell argues that the debarment was procedurally defective because GSA failed to hold a formal hearing and make written findings of fact. This claim is unlikely to succeed, for largely the same reasons as Campbell's argument that GSA failed to analyze mitigating factors.

As part of the pre-debarment procedure applicable to Campbell under the FAR, the debarring agency must provide an opportunity for a trial-like hearing and prepare written findings of fact "if it is found that the contractor's submission in opposition raises a genuine dispute over facts material to the proposed debarment." 48 C.F.R. § 9.406-3(b)(2), (d)(2)(i).

However, as discussed above, it is doubtful that the FAR's pre-debarment procedures applied to GSA's consideration of Campbell's January 2020 submission.  That submission was more likely a request for post-debarment relief, subject to GSA's broad discretion.[3]

Even if the FAR's pre-debarment procedures did apply to Campbell's 2020 submission, she would not be likely to succeed on her claim that GSA improperly denied her a formal hearing and written findings of fact.  The Court owes substantial deference to GSA's determination that a formal hearing and written fact-finding were unnecessary.  Waterhouse, 874 F. Supp. at 9.  Campbell argues that her submission raised material factual disputes regarding (1) T3's relationship with Motir; (2) employee sharing between T3 and Motir; (3) "the limited assistance Ms. Campbell provided to Mr. Ray" in getting DSI certified as an 8(a) contractor; and (4) the alleged fake contracts.  Pl.'s Mem. 30.  However, on closer inspection, Campbell's submission does not substantively dispute any material factual statement in the Proposal, but merely takes issue with GSA's characterization of the alleged misconduct.  For example, while Campbell protests that she did not "create" any "fake contract[s]," Pachter Decl. Ex. C at JC0008 ¶ 9, she admits that she entered information provided by Mr. Ray into online forms, and she does not deny knowing that the information was false.  Id.  Here as in Waterhouse, "[t]he Court agrees with the debarring official that the essential facts are undisputed and, more importantly, it concludes that it was not an abuse of discretion for the debarring official to so conclude."  874 F. Supp. at 9.

---

[3] Campbell argues that even before her January 2020 submission, the record before GSA "contained ample evidence of genuine disputes of material fact."  Pl.'s Mem. 29.  By this, she seems to mean simply that the evidence was inconclusive as to certain issues.  But GSA's obligation to hold a hearing and make written factual findings arises only if "*the contractor's submission in opposition* raises a genuine dispute over facts material to the proposed debarment." 48 C.F.R. § 9.406-3(b)(2) (emphasis added).

6. *Did GSA unlawfully treat Campbell more harshly than others involved in the same alleged scheme?*

Campbell's next argument is that GSA irrationally treated her more harshly than similarly situated parties.  Specifically, GSA entered an Administrative Compliance Agreement (ACA) with several individuals and entities who were, in Campbell's view, accused of "far more serious" wrongdoing in connection with the same alleged scheme.  Reply 18.

For this theory, Campbell relies on Caiola v. Carroll, 851 F.2d 395 (D.C. Cir. 1988).  In Caiola, the government debarred two corporate officials by imputing the conduct of their employer to them, but in the same administrative decision, it declined to impute the corporation's acts to a third, identically situated respondent.  851 F.2d at 397-98.  The D.C. Circuit rejected this internally inconsistent logic.  Id. at 400.  However, the Circuit has since clarified that Caiola does not authorize courts to compare one individual's "completed" debarment against the debarring agency's "decision not to pursue enforcement against" similarly situated individuals.  Kisser, 14 F.3d at 620.  Such judicial scrutiny would be improper because an agency's decision not to take debarment action falls within its unreviewable prosecutorial discretion.  Id.

Kisser forecloses Campbell's attempt to analogize this case to Caiola.  GSA's decision to settle its debarment action against Irono and Motir rather than pursue debarment was an exercise of unreviewable prosecutorial discretion.  See Baltimore Gas & Elec. Co. v. FERC, 252 F.3d 456, 461 (D.C. Cir. 2001).  GSA therefore need not "demonstrate consistency in exercising its discretion" to abandon debarment actions.  Kisser, 14 F.3d at 619 n.5.

7. *Was GSA's decision improperly punitive?*

Finally, Campbell claims that GSA improperly debarred her as a punitive measure, not to protect the public interest.  See 48 C.F.R. § 9.402(b) (debarment may not be used "for purposes

of punishment").  She argues that "the Government's repeated and egregious failures to comply

with the FAR debarment regulations" reveal a punitive motive.  Pl.'s Mem. 38.

The Court does not accept the premise that GSA committed "repeated and egregious"

errors.  As discussed above, Campbell is not likely to succeed in showing that GSA violated any

regulation in debarring her.  She therefore cannot bootstrap her critiques of the administrative

proceedings into a conclusion that GSA likely intended to punish her.

* * *

Accordingly, Campbell has not carried her burden to show a likelihood of success on the

merits.  Although this failure likely forecloses preliminary relief, see Sherley, 644 F.3d at 393,

the Court will analyze the remaining preliminary injunction factors.

B.  Irreparable Harm

The parties vigorously dispute whether Campbell has demonstrated irreparable harm in

the absence of preliminary relief.  Informed by the full record, including the late revelation that

Campbell is currently managing a hospice, the Court finds that she has not met this requirement.

"[T]he degree of proof required for irreparable harm is high[.]"  Olu-Cole v. E.L. Haynes

Pub. Charter Sch., 930 F.3d 519, 529 (D.C. Cir. 2019) (internal quotation marks omitted).  "The

injury must be both certain and great; it must be actual and not theoretical and of such

imminence that there is a clear and present need for equitable relief."  Id. (cleaned up).  The

injury in question must be one that the court could remedy by issuing a preliminary

injunction.  See Hispanic Affairs Project v. Perez, 141 F. Supp. 3d 60, 69-70 (D.D.C. 2015);

Elec. Priv. Info. Ctr. v. Dep't of Com., 356 F. Supp. 3d 85, 96 (D.D.C.), vacated on other

grounds, 928 F.3d 95 (D.C. Cir. 2019).  Similarly, if the plaintiff has a duty to mitigate damages,

the Court will not find irreparable harm based on an economic injury the plaintiff could avoid.

See Lanvin Inc. v. Colonia, Inc., 739 F. Supp. 182, 192-93 (S.D.N.Y. 1990) (citing Am. Brands, Inc. v. Playgirl, Inc., 498 F.2d 947, 949-50 (2d Cir. 1974)); Flood v. Kuhn, 309 F. Supp. 793, 800 (S.D.N.Y. 1970).

Campbell argues that she is suffering essentially three types of harm: (1) reputational damage; (2) loss of ability to work in the hospice field, which gives her personal satisfaction; and (3) loss of income.  See Pl.'s Mem. 39; Reply 20-22.  The Court will address each in turn.

First, nothing in the record shows that Campbell is suffering any particularized, irreversible reputational injury.  While debarment certainly *can* harm a contractor's reputation, see Gonzalez v. Freeman, 334 F.2d 570, 574 (D.C. Cir. 1964), the Court cannot conclude without specific evidence that Campbell faces such harm.  "[O]therwise, all debarred contractors . . . would be able to show irreparable injury simply by being debarred."  Mobley v. Cheney, CIV. A. No. 90–1580 SSH, 1990 WL 141750, at *1 n.2 (D.D.C. Sept. 20, 1990).

Second, Campbell's supplemental declaration undermines her argument that her debarment is denying her the personal fulfillment of working in the hospice field.  As she now admits, she is currently managing a new hospice, Lighthouse, on a volunteer basis.  Second Campbell Decl. ¶¶ 6-9.  She contends that without a preliminary injunction, Lighthouse will need to shut down because Campbell's debarment prevents the hospice from billing Medicare and Medicaid.  Id. ¶ 13.  However, Campbell has not met her high burden of proof to show that Lighthouse's collapse is imminent.  She offers no evidence for this proposition except her own declaration.  A single declaration without specific financial figures is not particularly strong evidence, especially when the declarant has not shown herself to be an entirely reliable narrator.

24

Third, the Court cannot conclude that Campbell's loss of income constitutes irreparable harm because she has not shown that she cannot avoid this loss, nor has she shown that a preliminary injunction would make a difference in her earnings.

As Campbell points out, the government is immune from damages for any violations of the APA.  See Lane v. Pena, 518 U.S. 187, 196 (1996).  Although it is "well settled that economic loss does not, in and of itself, constitute irreparable harm," Wis. Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985), lost business revenue that will be unrecoverable due to sovereign immunity can count as irreparable injury, particularly where there is evidence that the business faces imminent collapse without preliminary relief.  See Alcresta Therapeutics, Inc. v. Azar, 755 F. App'x 1, 5 (D.C. Cir. 2018).  However, "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm." Nat'l Mining Ass'n v. Jackson, 768 F. Supp. 2d 34, 53 (D.D.C. 2011).  Assuming Campbell is correct that she faces unrecoverable economic losses, the Court still must consider whether other factors make this injury an inappropriate basis on which to find irreparable harm.

As the D.C. Circuit has explained in the context of unfair labor practice disputes, a person losing employment income "must make a reasonably diligent search for suitable [alternative] employment" to mitigate the loss.  NLRB v. Madison Courier, Inc., 505 F.2d 391, 395 (D.C. Cir. 1974); see also Conn v. Am. Nat'l Red Cross, 149 F. Supp. 3d 136, 152 (D.D.C. 2016) (Cooper, J.) (applying same standard for job search in employment discrimination case).

Here, the record raises substantial doubts about the diligence of Campbell's search for a suitable new job to replace her income from Homestead.  By her own account, Campbell applied for ten to twelve jobs in the hospice and healthcare fields, over no more than a few months, before abandoning the search to focus on her unpaid work at Lighthouse.  Second Campbell

Decl. ¶ 5.  Her understanding is that "*nearly* all" hospice providers accept Medicare and

Medicaid patients and therefore cannot hire a debarred employee.  <u>Id.</u> (emphasis added).  This

evidence suggests that Campbell could have done far more to look for a suitable paying job,

either at one of the few hospices that could employ her or elsewhere in the healthcare industry.[4]

<u>Cf.</u> <u>Gentry v. E. W. Partnership Mgmt. Co. Inc.</u>, 816 F.3d 228, 241 (4th Cir. 2016) (upholding

finding that plaintiff's year-long job search was insufficient).

     Even assuming Campbell did satisfy her duty to mitigate damages, she fails to

demonstrate that the Court can redress her economic loss by issuing a preliminary injunction.

While Campbell's debarment clearly makes her ineligible to work for some employers, including

Homestead, the record is silent on whether any of those employers would choose to hire her if

the Court were to order temporary relief from the debarment.  Indeed, to the extent Campbell's

debarment is a barrier to employment, it seems likely that employers would also be wary of

hiring an employee who is *temporarily* un-debarred and faces potential re-debarment.  Similarly,

on the current record, the Court can only speculate as to whether Lighthouse would earn revenue

and enable Campbell to pay herself a salary if the debarment were lifted.  This problem

undermines Campbell's irreparable-harm argument.  <u>See</u> <u>Hispanic Affairs Project</u>, 141 F. Supp.

3d at 69-70 (plaintiff failed to show irreparable injury because the requested preliminary

injunction would not guarantee him the type of job he was seeking); <u>Flood</u>, 309 F. Supp. at 800.

---

[4] To the extent that mitigating her lost wages would require her to accept a non-hospice job, Campbell might argue that she is being irreparably harmed because she must choose between earning money and pursuing her passion for hospice work.  However, the record does not show that Campbell cannot do both—that is, volunteer in a hospice setting while earning income in another subfield of healthcare.  If anything, it tends to show that Campbell is capable of multitasking.  <u>See</u> Second Campbell Decl. ¶ 3 (Campbell incorporated Lighthouse while employed at Homestead).

Campbell therefore has not made the required showing of irreparable harm.

C.  Balance of the Equities and the Public Interest

Two preliminary injunction factors remain to consider: the balance of the equities and the public interest.  In a case against the government, these factors merge.  See Pursuing Am.'s Greatness v. FEC, 831 F.3d 500, 511 (D.C. Cir. 2016).

Some equitable factors support a preliminary injunction.  Lifting Campbell's debarment would increase the probability of her being able to remain in the hospice field.  Other things being equal, it is in the public interest for capable professionals to pursue much-needed hospice work.  Moreover, although the process leading to Campbell's debarment was likely lawful, it is unfortunate that she did not receive the Proposal before being debarred.  A preliminary injunction could arguably serve an equitable interest in giving contractors a full opportunity to respond to proposed debarments.

However, the equities weighing against a preliminary injunction are greater.  The government—and, by extension, the public—has a compelling interest in enforcing the debarments of contractors who have properly been found presently irresponsible.  See Caiola, 851 F.2d at 399 ("Debarment reduces the risk of harm to the system by eliminating the source of the risk, that is, the unethical or incompetent contractor.").  That Campbell has no plans to bid on federal acquisition contracts does not mean that the government has no reason to debar her. Managers of healthcare providers that accept Medicare and Medicaid patients occupy a position of public trust, given their ability to bill the government for services.  Debarring irresponsible individuals may help protect the public against waste, fraud, and abuse by preventing those individuals from working as managers at federally funded healthcare facilities.  While the Court reaches no conclusion on whether Campbell is presently irresponsible, the record suggests that

she may have engaged in serious past misconduct, and her inconsistent candor to the Court so far does not engender confidence in her present responsibility.

Overall, the balance of the equities and the public interest weigh against issuing a preliminary injunction.

**IV.    Conclusion**

For the foregoing reasons, the Court will deny Plaintiff's Motion for Preliminary Injunction.  A separate Order shall accompany this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  <u>November 3, 2020</u>